UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| BRIAN KING, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | Civil Action No. 1:15-cv-10498-IT |
| | * | |
| COVIDIEN PLC and | * | |
| JOSE E. ALAMEIDA, | * | |
| | * | |
| Defendants. | * | |

MEMORANDUM & ORDER

January 28, 2016

I.      Introduction

Plaintiff Brian King ("King") filed this action against his former employer, Defendant

Covidien PLC ("Covidien" or "the company"), and its former CEO and President, Jose E.

Almeida ("Almeida")[1] (collectively "Defendants").  Before the court is Defendants' motion to

dismiss the First Amended Complaint in its entirety for failure to state a claim upon which relief

can be granted.  For the following reasons, the motion is ALLOWED.

II.     Alleged Facts[2]

In April 2004, King began working for Covidien as Vice President of Operational

Excellence.  First Am. Compl. ¶ 7.  King was promoted several times and by 2010 was named

President of Emerging Markets.  Id. ¶ 8.  In 2014, King reported directly to the Chairman,

---

[1] The caption of the First Amended Complaint names "Jose E. Alameida" as a defendant but throughout the complaint he is referred to as "Almeida" and Defendants state the correct spelling is "Almeida."  See Notice of Removal [#1] at 1.

[2] For the purposes of a motion to dismiss, the court accepts as true the factual allegations pleaded in King's Amended Complaint.  Shaner v. Chase Bank USA, 587 F.3d 488, 490 (1st Cir. 2009).

President, and CEO of the company, was a member of the Executive and Operating Committees, and was one of two executives in the CEO succession plan.  Id. ¶ 9.

In March 2011, Almeida became the President and CEO of Covidien.  Id. ¶ 19. Approximately four months later, in July 2011, Almeida's brother-in-law Bryan Hanson ("Hanson") was promoted to the position of Group President, Advanced Surgical, which reported directly to Almeida.  Id. ¶ 20.  Hanson's promotion violated Covidien's then-existing anti-nepotism policy.  Id. ¶ 21.  However, one month after Hanson's promotion, in August 2011, Covidien's anti-nepotism policy was amended so as to permit then-existing relationships, including Hanson and Almeida's, that would otherwise violate the policy.  Id. ¶ 22.

King alleges that there were "widespread concerns" at Covidien about Hanson's role in the company because it conflicted with the anti-nepotism policy.  Id. ¶ 24.  These complaints were expressed on "several occasions" including at several town hall-style company meetings between 2011 and 2013.  Id.  In addition, in the fall of 2011, King and Covidien's CFO had a private conversation with Almeida in which both King and the CFO expressed their concerns about Hanson's role in the company and his relationship to Almeida.  Id. ¶ 25.  During that conversation, Almeida indicated he would address the situation and ensure that Hanson would leave the company in due time.  Id. ¶ 26.  Hanson did not, however, leave the company.  Id.

In August 2013, Almeida announced a reorganization under which Hanson was given an even more significant role as Group President, Medical Devices & U.S.  Id. ¶ 28.  In response to this announcement, King again expressed concerns about Hanson's role and relationship with Almeida to Covidien's CFO who relayed King's concerns to Almeida directly.  Id. ¶ 29.  Shortly thereafter, in September 2013, Almeida conducted King's performance review, during which he praised King's performance and told him he was doing "a great job."  Id. ¶ 30.  Nonetheless, in

early 2014, King began to look for another job because it was by then clear to him that Covidien and Almeida were not going to address his concerns about Hanson's role in the company.  Id. ¶ 51.

In March 2014, King made a  formal complaint to Covidien's human resources and legal departments but was informed that the relationship "was 'grandfathered' under the company policy."  Id. ¶ 32.  King alleges that Almeida began to see King as a threat to Almeida and Hanson.  Id. ¶ 33.  King further alleges that, as a result of feeling threatened, Almeida began to limit the information that ordinarily would have been shared with someone in King's position at the company.  Id. ¶ 34.

According to an S-4 form filed with the Securities and Exchange Commission by the company Medtronic, on March 20, 2014, the Covidien Board discussed approaching Medtronic regarding a merger opportunity.  Id. ¶ 35.  Medtronic's S-4 form also reports that Almeida had a phone conversation with Medtronic's CEO on March 25, 2014 and that the parties met in person on April 2, 2014.  Id. ¶ 36.

In the first week of April 2014, John Griffin, Vice President & Deputy General Counsel ("Griffin") and Tracy Berns, Vice President & Chief Compliance & Regulatory Counsel ("Berns"), approached King and "informed him that nothing would change regarding Mr. Hanson's and Mr. Almeida's positions in the company."  Id. ¶ 48.  King alleges that Almeida "knew the substance of the message to be communicated [by Griffin and Berns] to King in response to his complaint."  Id. ¶ 49.

Medtronic's S-4 form further reveals that merger negotiations progressed after Griffin and Berns told King that nothing would change.  In particular, on April 11, 2014, Medtronic's CEO and Almeida met for a second time, this time with members of their respective

management teams.  Id. ¶ 37.  On April 23, 2014, the parties entered in to a 15-month

"standstill" agreement.  Id. ¶ 38.

Also as of late April 2014, Covidien's Executive Committee (of which King was a

member) had engaged in a full strategic planning process, a discussion of a three-year plan, and a

"Dual Champion" planning process.  Id. ¶ 40.  All of these planning processes contemplated

structural changes within Covidien as a standalone entity.  Id. ¶ 41.  At no point during these

Executive Committee meetings was the possibility of a merger with Medtronic raised, though

two of the eight members of the committee—Hanson and the Chief Medical Officer—were

aware of the Medtronic negotiations.  Id. ¶¶ 46-47.

Ultimately, based on his understanding from the Executive Committee's planning

processes that there were no changes to be made to Covidien's executive structure in the

foreseeable future, King accepted a position as the Chief Transformation Officer, DePuy Synthes

at Johnson & Johnson.  Id. ¶ 52.  Thereafter, on April 29, 2014, King exercised 15,569 of his

vested Covidien stock options at $70.10 per share.  Id. ¶ 68.  The next day, King met with

Almeida to tender his resignation.  Id. ¶ 53.  King told Almeida that though his written

resignation was effective May 16, 2014, he was willing to work into June 2014 if necessary.  Id.

¶ 54.  Almeida responded by telling King that his last day of employment would in fact be May

2, 2014.  Id. ¶ 55.  As King was leaving Almeida's office, Almeida put his arm around King and

said, "you will come back someday and be the next CEO of Covidien."  Id. ¶ 58.

On May 2 and May 4, 2014, Covidien and Medtronic management held further

discussions.  Id. ¶ 39.  Several weeks later, on June 15, 2014, Medtronic's acquisition of

Covidien was publicly announced.  Id. ¶ 66.  Immediately thereafter, the value of Covidien's

stock rose approximately 30% to $93 per share.  Id. ¶ 69.  Had King still been employed at

Covidien as of May 16, 2014 as he had originally intended, and had he not exercised his vested options the day before submitting his resignation, he would have had until June 16, 2014—the day the stock price jumped—to exercise the options.  Id. ¶ 71.

Additionally, after the merger was announced on June 15, 2014, executives at King's level were granted further incentives to stay with the company through the transition, in the form of accelerated vesting of unvested stock options and restricted shares.  Id. ¶ 76.  King suggests he would have received or been entitled to the same additional benefits had he remained at Covidien though the closing of the merger.

Finally, King participated in the Covidien's Supplemental Savings and Retirement Plan throughout his employment.  Id. ¶ 10.  When his employment terminated on May 2, 2014, approximately $3.7 million of King's deferred compensation was subject to the plan, and as of January 9, 2015, none of that deferred compensation had been paid to him.  Id.  ¶¶ 11, 13.

III.     Discussion

   A.  Legal Standard

To survive a motion to dismiss under Rule 12(b)(6), a complaint must contain sufficient factual material "to 'state a claim to relief that is plausible on its face.'"  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 559 (2007)).  In considering such a motion the court "construe[s] the well-pleaded facts in the light most favorable to the plaintiff[], accepting their truth and drawing all reasonable inferences in the plaintiff['s] favor."  Medina-Velazquez v. Hernandez-Gregorat, 767 F.3d 103, 108 (1st Cir. 2014).

A court considering a Rule 12(b)(6) motion is ordinarily limited to considering "only the complaint, documents attached to it, and documents expressly incorporated into it."  Foley v.

Wells Fargo Bank, N.A., 772 F.3d 63, 72 (1st Cir. 2014).  When, however, "a complaint's factual allegations are expressly linked to—and admittedly dependent upon—a document (the authenticity of which is not challenged), the document effectively merges into the pleadings and the trial court can review it in deciding a motion to dismiss under Rule 12(b)(6)."  Beddall v. State St. Bank & Trust Co., 137 F.3d 12, 17 (1st Cir. 1998).

B. *Analysis*

King alleges state law causes of action for (1) fraudulent misrepresentation; (2) negligent misrepresentation; (3) breach of fiduciary duty; (4) implied covenant of good faith and fair dealing; and (5) violation of Massachusetts Wage Act, Mass. Gen. Laws ch. 149, § 148.  Counts I, II, IV and V are alleged against both Defendants while Count III is alleged against Almeida only.  Defendants removed this action from state court on the ground that Counts IV and V are completely pre-empted by the Employee Retirement Income Security Act (ERISA).  Because Defendants' claim of complete preemption is the asserted basis for this court's subject matter jurisdiction, the court will address these causes of action first.

1. *Count IV—Breach of Implied Covenant of Good Faith and Fair Dealing*

King alleges that Defendants terminated him in order to avoid paying benefits that would have been due to him under the "change in control provisions" of Covidien's severance and change-in-control plans had he remained employed at Covidien and been terminated or left as a result of merger.  First Am. Compl. ¶¶ 14-18, 103; Notice of Removal, Ex. B [hereinafter "Covidien Severance Plan"]; Ex. C [hereinafter "Covidien Change in Control Plan"].  The cause of action is pleaded as a violation of the state-law "Fortune doctrine" which recognizes that the covenant of good faith and fair dealing implied in all contracts applies equally to contracts for employment.  See Fortune v. Nat'l Cash Register Co., 364 N.E.2d 1251, 1257-58 (Mass. 1977).

Specifically, <u>Fortune</u> held that the implied covenant of good faith and fair dealing prohibits an

employer from terminating an employee in order to deprive the employee of compensation due

for past services.  <u>Id.</u> at 1257.

Defendants assert, however, that King's <u>Fortune</u> cause of action is preempted by ERISA.

ERISA preempts any state law cause of action that "relates to" an ERISA-regulated "employee

benefit plan."  29 U.S.C. § 1144(a) (ERISA "shall supersede any and all State laws insofar as

they may now or hereafter relate to any employee benefit plan" regulated by ERISA).

King responds first that whether Covidien's change-in-control and severance plans are

"employee benefit plans" regulated by ERISA is a fact-intensive inquiry not amenable to

resolution on a motion to dismiss.  Although the question of whether an ERISA plan exists is a

fact-dependent one, it can be resolved in this case by review of the plan documents.[3]

Under ERISA, "employee benefit plans" consist of "employee welfare benefit plans" and

"employee pension benefit plans."  29 U.S.C § 1002(3).   In either case, a plan qualifies as an

"employee benefit plan" if its "provision by nature requires an ongoing administrative program

to meet the employer's obligation."  <u>Fort Halifax Packing Co. v. Coyne</u>, 482 U.S. 1, 11 (1987).

Thus, a severance or change-in-control plan is not an ERISA employee benefit plan if it involves

the one-time lump-sum payment of an amount that can be determined by "simple arithmetic."

<u>O'Connor v. Commonwealth Gas Co.</u>, 251 F.3d 262, 268 (1st Cir. 2001) (severance "plan" that

provided for single payment based on a uniform rate of accumulation and did not involve

---

[3] King did not annex any of the three plans to his First Amended Complaint but does describe
them in detail in the First Amended Complaint.  <u>See</u> First Am. Compl. ¶¶ 7-18.  Defendants have
provided them with Defendants' Notice of Removal and King has not disputed their authenticity.
Thus, because King's fourth and fifth causes of action seek recovery for interference with and/or
improper withholding of benefits due to him under those plans, the First Amended Complaint is
"expressly linked to" and "admittedly dependent upon" the plans, and the court may properly
consider them on this motion to dismiss.  <u>Beddall</u>, 137 F.3d at 17.

employer discretion was not an ERISA plan).  By contrast, a plan that provides for benefits to be administered over a long time period, the plan administrator to make some individualized decisions, and at least one criterion that is not "mechanical," is an ERISA plan.  Simas v. Quaker Fabric Corp. of Fall River, 6 F.3d 849, 854 (1st Cir. 1993).  "The determination of what constitutes an ERISA plan thus turns most often on the degree of an employer's discretion in administering the plan."  O'Connor, 251 F.3d at 267.  The more the plan requires discretionary rather than "mechanical" decisions to be made by the employer, the more likely it is to be an ERISA plan.

Here, Covidien's severance and change-in-control plans involve a significant degree of employer discretion.  Specifically, the severance plan provides that an "Eligible Employee" shall receive his or her "Base Salary" in equal installments over the "Severance Period" among other benefits.  See Covidien Severance Plan at 8.  Whether an individual qualifies as an "Eligible Employee" and the level of benefits to which that employee is entitled are determinations entrusted sole discretion of the employer, id. at 3, and the duration of the "Severance Period" are individualized determinations that vary from employee to employee, id. at 5.  Moreover, the "Severance Period" requires "ongoing" payments over a period of 12 to 24 months.  Id. at A-1.  Similarly, the change-in-control plan sets forth numerous conditions of eligibility for any benefits under the plan, affords the employer "sole discretion" to determine whether an employee has fully complied with all eligibility requirements, and establishes a complex formula for determining the amount of an employee's benefits that depends on the timing and amount of the particular employee's annual bonus among other things.  See Covidien Change in Control Plan at 7-9.  Thus, both plans establish ongoing administrative schemes that require individualized and in many cases discretionary determinations of who is entitled to benefits, of what amount, and

8

for how long.  Both the severance and change-in-control plans are, therefore, "employee benefit plans" under ERISA.

King argues that even if the plans are ERISA plans, the <u>Fortune</u> cause of action is not preempted because it does not sufficiently "relate to" them.  A cause of action "relates to" an ERISA plan if it requires the plaintiff to plead and the court to find the existence of an ERISA plan in order to prevail, or if it conflicts directly with an ERISA cause of action.  <u>Ingersoll-Rand, Co. v. McClendon</u>, 498 U.S. 133, 140-142 (1990).

Defendants contend that King's <u>Fortune</u> cause of action is preempted by §§ 502 and 510 of ERISA.  Section 510 makes it unlawful to "discharge . . . a participant . . . for the purpose of interfering with the attainment of any right to which such participant may become entitled" under an "employee benefit plan," 29 U.S.C. § 1140, and § 502 provides the exclusive civil enforcement remedy for violations of section 510,  <u>Pilot Life Ins. Co. v. Dedeaux</u>, 481 U.S. 41, 54 (1987).  King argues that his <u>Fortune</u> cause of action does not "relate to" the ERISA severance and change-in-control plans because he does not allege that Defendants terminated him solely to avoid paying him benefits due under those plans.  Rather, King contends that Defendants terminated him to avoid paying him "additional cash and equity benefits actually granted to similarly situated executives in connection with the merger" and "his own future earnings at the company" in addition to benefits due under the severance and change in control plans.  Pl.'s Mem. Law Opp'n Mot. Dismiss 13 [#17] [hereinafter "Opp'n"].

Terminating an employee to prevent him from receiving "future earnings" or benefits contingent on remaining employed by a company is not a breach of the implied covenant of good faith and fair dealing.  <u>Gram v. Liberty Mut. Ins. Co.</u>, 429 N.E.2d 21, 29 (Mass. 1981) ("[T]he obligation of good faith and fair dealing imposed on an employer requires that the employer be

liable for the loss of compensation that is so clearly related to an employee's *past service*, when the employee is discharged without good cause.") (emphasis added); see also Rodio v. R.J. Reynolds Tobacco Co., 416 F. Supp. 2d 224, 235 (D. Mass. 2006) ("The implied covenant of good faith and fair dealing 'does not protect interests contingent on an event that has not occurred,' such as continued employment.") (quoting Harrison v. NetCentric Corp., 744 N.E.2d 622, 631 (Mass. 2001)).  Thus, insofar as the First Amended Complaint is construed, as King contends it should be, to allege that Defendants breached the implied covenant of good faith and fair dealing by depriving King of future salary or benefits paid to similarly situated employees contingent on their staying at Covidien through the merger,[4] that portion of his Fortune claim would fail.  See Harrison, 744 N.E.2d at 630.  Accordingly, the only benefits of which King could have been unlawfully deprived under Fortune are benefits provided for under the ERISA-regulated severance and change in control plans.  The very existence of these plans is, therefore, necessary to establishing liability under King's state-law Fortune cause of action and that cause of action is preempted.  See Ingersoll-Rand, 498 U.S. at 139-40; cf. St. Arnaud v. Chapdelaine Truck Ctr., Inc., 836 F. Supp. 41, 43 (D. Mass. 1993) (holding state law wrongful termination claim based on employer's effort to avoid paying pension benefits preempted by § 510 of ERISA) (citing Treadwell v. John Hancock Mut. Life Ins. Co., 666 F. Supp. 278, 282 (D. Mass. 1987)).

King asks that he be permitted to amend his complaint to modify Count IV as a claim for relief under § 510 of ERISA.  Opp'n at 14.  The court will allow King to make this request by

---

[4] Paragraph 105 of the First Amended Complaint states, in relevant part, that "Defendants breached the covenant of good faith and fair dealing implied in Mr. King's employment with Covidien by terminating his employment in an effort to avoid . (sic)"  Thus, due to what may be a drafting error, King's First Amended Complaint does not clearly identify the benefits that King alleges Defendants sought to avoid paying him in allegedly terminating his employment.

motion for leave to amend his complaint to modify Count IV to state a claim for relief under § 510 of ERISA.  Such motion shall be supported by a memorandum demonstrating that amendment would not be futile.

2.      *Count V—Violation of Massachusetts Wage Act*

Count V of the Amended Complaint alleges that Defendants failed to pay King wages earned under Covidien's Supplemental Savings and Retirement Plan ("SSRP") within six days of his separation from Covidien, in violation of the Massachusetts Wage Act.  First Am. Compl. ¶ 110.  Mass. Gen. Laws ch. 149, § 148 requires wages to be "paid in full" to a discharged employee "on the day of his discharge" and that "in no event shall wages remain unpaid by any employer for more than six days from the termination of the pay period in which such wages were earned by the employee."  Defendants contend that King's Wage Act cause of action is also preempted because the SSRP is an ERISA "employee benefit plan" and the cause of action "relates to" it.

Defendants are correct that the SSRP is an ERISA plan because Covidien has considerable discretion in administering it.[5]  However, deferred compensation contributions under the SSRP are not "wages" within the meaning of the Wage Act, Bos. Police Patrolmen's Ass'n, Inc. v. City of Bos., 761 N.E.2d 479 (Mass. 2002), and accordingly, the Wage Act cause of action fails not because it is preempted, but because it fails to state a claim upon which relief may be granted.

---

[5] For instance, the SSRP administrator has sole discretion to make factual determinations necessary to carry out the plan and to determine when an employee has been terminated "for cause" and is ineligible to participate in the plan.  Defs.' Notice of Removal, Ex. C [hereinafter "Covidien SSRP"] §§ 2.11, 3.1.  This broad discretion in administering the SSRP makes it an ERISA plan.  See Simas, 6 F.3d at 853 (finding ERISA plan where plan required administrator to determine whether an employee was terminated "for cause or is otherwise ineligible for unemployment benefits" before paying any benefit under the plan).

In <u>Boston Police Patrolmen's Ass'n</u>, the Massachusetts Supreme Judicial Court held that deferred compensation contributions held by an employer for the purpose of the employee obtaining a federal tax benefit are not the property of the employee and "are not 'wages' under the weekly wage law." <u>Id.</u> at 481.  Here, the SSRP provides for deferred compensation to remain the property of Covidien until disbursed to the employee so that, pursuant to the Internal Revenue Code, the employee does not owe income tax on the deferred compensation until it is distributed.  Covidien SSRP §§ 8.7, 10.12; 26 U.S.C. § 409A(a)(1)(A).  Therefore, under <u>Boston Police Patrolmen's Ass'n</u>, King's deferred compensation was not "wages" subject to the Massachusetts Wage Act.

King's attempts to distinguish <u>Boston Police Patrolmen's Ass'n</u> and to argue that subsequent cases have strictly limited that case to its facts are unavailing.  King argues that <u>Boston Police Patrolmen's Ass'n</u> held that the deferred compensation is not "wages" for the purposes of the Wage Act's provision requiring that wages be paid within six or seven days of the date the wages were earned and not for the purposes of the provision requiring that wages be paid to discharged employees on the date of discharge.  However, the statute only defines the term "wages" once, and none of the cases cited by King suggest that the statute characterizes wages due upon separation from employment differently than wages due while still employed.  Moreover, in the cases cited by King in which courts found deferred payments to be "wages" under the Act, the employer had not withheld payments pursuant to a deferred compensation plan and/or the employee did not receive any tax benefit from the employer withholding the compensation.  See <u>Allen v. Intralearn Software Corp.</u>, 2006 Mass. App. Div. 71 (Mass. Dist. Ct. 2006) (deferred salary payments were wages where employer did not withhold payment pursuant to deferred compensation plan established for the purpose of providing a tax benefit); <u>Stanton v.</u>

Light House Fin. Servs. Inc., 621 F. Supp. 2d. 5 (D. Mass. 2009) (same); Dobin v. CIOview Corp., No. 2001-00108, 2003 WL 22454602 (Mass. Super. Ct. Oct. 29, 2003) (same); Tze-Kit Mui v. Mass. Port Auth., No 14-3275, 2015 WL 1842635 (Mass. Super. Ct. Apr. 1, 2015) (unused sick time was "wages"); Pacheco v. H.N. Goren, Inc., No. 09-1496, 2011 WL 2176386 (Mass. Super. Ct. May 10, 2011) (employer's deductions for contributions to accounts established under 26 U.S.C. § 408(k) are wages because they are held "for the exclusive benefit of the employee" and are not be the property of the employer); Awuah v. Coverall North Am., Inc., 740 F. Supp. 2d 240 (D. Mass. 2010) (pay withheld by employer who had misclassified employee as independent contractor was "wages"). Here, on the other hand, King obtained a tax benefit by deferring payment of compensation pursuant to the SSRP, just as the officers had in Boston Police Patrolmen's Ass'n. In short, King has cited no authority for this court to conclude that compensation deferred pursuant to the SSRP should be treated any different that the compensation at issue in Boston Police Patrolmen's Ass'n.

Accordingly, King's Wage Act cause of action fails to state a claim because his deferred compensation under the SSRP is not wages subject to the requirements of the Wage Act.

### 3.     Count I—Fraudulent Misrepresentation

King's first cause of action alleges that Defendants fraudulently misrepresented the future course of Covidien's corporate structure and that he reasonably relied on those false statements in making decisions regarding his future employment.

A claim for fraudulent misrepresentation under Massachusetts law requires that the defendant made a "false representation of a material fact with knowledge of its falsity for the purpose of inducing the plaintiff to act thereon, and that the plaintiff relied upon the representation as true and acted upon it to [his] damage." Masingill v. EMC Corp., 870 N.E.2d

81, 90 (Mass. 2007) (citation and quotation omitted); see also Rodi v. S. New Eng. Sch. of Law, 389 F.3d 5, 13 (1st Cir. 2004). Silence or a "bare nondisclosure" ordinarily does not give rise to a claim for misrepresentation. Swinton v. Whitinsville Sav. Bank, 42 N.E.2d 808, 809 (Mass. 1942); see also Nei v. Boston Survey Consultants, Inc., 446 N.E.2d 681, 683 (Mass. 1983) (no "duty to speak" where "[t]here is no allegation that the defendants made any false statements or misrepresentations" and "no suggestion that the defendants made a partial disclosure or stated a half truth which may be tantamount, under certain conditions, to a falsehood if there is no further expatiation"); Greenery Rehab. Grp., Inc. v. Antaramian, 628 N.E.2d 1291, 1294 (Mass. App. Ct. 1994) (when a "seller knows of a weakness in the subject of the sale and does not notify the buyer of it" the nondisclosure does not amount to fraud). However, if one does speak on a topic he has an obligation to do so honestly "and to divulge all the material facts bearing upon the point that lie within his knowledge." Kannavos v. Annino, 247 N.E.2d 708, 711 (Mass. 1969). Similarly, a speaker may be obligated to disclose information where disclosure is necessary to make prior statements not misleading. See V.S.H. Realty, Inc. v. Texaco, Inc., 757 F.2d 411, 414 (1st Cir. 1985) ("There is much case law in Massachusetts supporting the proposition that a party who discloses partial information that may be misleading has a duty to reveal all the material facts he knows to avoid deceiving the other party."); Restatement (Second) of Torts § 551(2)(b).

Rule 9(b)'s heightened pleading standard for fraud allegations applies to a cause of action for misrepresentation. Alt. Sys. Concepts, Inc. v. Synposys, Inc. 374 F.3d 23, 29 (1st Cir. 2004). Under the Rule 9(b) standard, a plaintiff generally must identify the person who made the false statement with knowledge of its falsity, when the statement was made, and what was said. Rodi, 389 F.3d at 15.

The First Amended Complaint alleges that the Defendants' false statements consisted of: (1) "statements regarding the future course of the company, including statements made in connection with the Executive Committee strategic planning, the three year plan and the Dual Champion planning" (First Am. Compl. ¶ 79); and (2) Almeida's statement that Mr. King would return to become CEO of Covidien someday (Id. ¶ 80).

Taking these statements in reverse order, Almeida's statement that King would come back to be CEO of Covidien cannot give rise to a claim for fraudulent misrepresentation because the First Amended Complaint alleges that King had decided to leave Covidien and had exercised his stock options before this statement was made.  See First Am. Compl. ¶¶ 52-54, 58 (stating that King accepted an executive employment opportunity with Johnson & Johnson and notified Almeida of the decision on April 30, 2014 and that Almeida made the challenged statement at the end of that meeting); ¶ 68 (stating that King vested his stock options April 29, 2014). Therefore, King could not have relied on this statement to his detriment and it cannot form the basis of his misrepresentation claim.  Indeed, King's counsel conceded as much at oral argument.

King's allegations regarding Defendants' statements about the future course of the company do not identify any false statements made by persons with knowledge of their falsity. With regard to the Executive Committee, the First Amended Complaint does not identify with particularity when any false statements were made, who made them, or what was said that "led [King] to believe that the proposed internal changes were being implemented, and that there were no other significant structural changes on the horizon."  Id. ¶ 44.  Indeed, the First Amended Complaint alleges generally and vaguely that it was the "content" of the Executive Committee meetings up through the April 2014 meeting, and materials shared at those meetings, that led King to believe that no merger was contemplated, not any particular statement or

statements.  Id.  Accordingly, allegations as to general content of meetings lack the particularity

required by Rule 9(b) and fail to state a claim for fraudulent misrepresentation.

King does allege that he spoke with Griffin and Berns (who), in the first week of April

2014 (when), and that they told him in response to his complaint about nepotism that nothing

would change regarding Hanson's or Almeida's position in the company (what).  See Rodi, 389

F.3d at 15.  These allegations, however, do not support an inference that Griffin and Berns'

statement that Almeida and Hanson's roles would not change was in fact false at the time it was

made (in early April 2014).  At that time, there was no change in the company's position as to

the nepotism issue and, with regard to the merger, only one telephone conversation and one in

person meeting between the CEOs of Medtronic and Covidien had taken place.

King nonetheless contends that, even if not false, Griffin and Berns' statement regarding

Almeida and Hanson was a misleading half-truth regarding the possibility of a merger that

became increasingly untrue as the merger negotiations became more certain, and that Defendants

had a duty to correct or update those statements by disclosing the merger negotiations to King.

This argument might have some force if King had alleged that Griffin, Berns, or anyone else had

said anything about the merger negotiations or if King had asked anyone about the possibility of

a merger.  See Maxwell v. Ratcliffe, 254 N.E.2d 250, 252 (Mass. 1969) (a "special obligation on

the brokers to avoid half-truths and make disclosures" exists when the issue had been "raised

expressly"); Kannavos, 247 N.E.2d at 711 (there is "no duty imposed upon one party to a

transaction to speak for the information of the other" but "if he does speak *with reference to a

given point of information*. . . he is bound to speak honestly") (emphasis added).  But here, King

does not allege that any Defendant made any statement, misleading or otherwise, about the

merger negotiations. Therefore, no statement requiring correction or updating was ever made

about the merger, and Defendants' choice to remain silent on that topic was nothing more than a "bare nondisclosure" that does not amount to a fraudulent misrepresentation. Swinton, 42 N.E.2d at 809; see also Smith v. Zipcar, Inc., --- F. Supp. 3d --- (D. Mass. 2015), Civil Action No. 1:13-cv-11430, 2015 WL 5074474 at *5 (D. Mass. Aug. 27, 2015) (holding employer's non-disclosure of merger negotiations was not a basis for fraudulent misrepresentation claim where employee "never asked, and no misleading misstatements or half-truth about the preliminary merger discussions was made").

Moreover, even if the statements could be characterized as misleading partial statements about the merger, the allegations do not support a plausible inference that they were provided to King "for the purpose of inducing [him] to act thereon," as is required for a cause of action for fraudulent misrepresentation. Masingill, 870 N.E.2d at 90. Particularly in the absence of any allegation that Defendants knew that King was thinking of leaving Covidien or knew that he was basing any decision on information Defendants supplied to him, the court cannot reasonably infer that any alleged misrepresentations were given for the purpose of inducing him to act thereon. Furthermore, King's allegations as to why Defendants concealed information suggest, at most, that Almeida sought to mislead King because he felt "threatened" by him or wanted to retaliate for King speaking out about his concerns about nepotism, not to induce King to leave Covidien. First Am. Compl. ¶ 33.

Accordingly, the First Amended Complaint fails to state a claim for intentional misrepresentation and that cause of action is dismissed.

### 4.        Count II—Negligent Misrepresentation

Count II of King's First Amended Complaint alleges that Defendants are liable for negligent misrepresentation for making the same statements that the court has concluded are

insufficient to state a claim for fraudulent misrepresentation.  See First Am. Compl. ¶¶ 92-93.  Massachusetts courts follow the Restatement's definition of negligent misrepresentation which requires that a defendant "(1) in the course of its business, (2) supplied false information for the guidance of others (3) in their business transactions, (4) causing and resulting in pecuniary loss to those others (5) by their justifiable reliance on the information, and (6) with failure to exercise reasonable care or competence in obtaining or communicating the information."  Cummings v. HPG Int'l Inc., 244 F.3d 16, 24 (1st Cir. 2001) (citing Fox v. F & J Gattozzi Corp., 672 N.E.2d 547, 551 (Mass. App. Ct. 1996)).

The Restatement further specifies that liability for negligent misrepresentation is limited, in relevant part, to "loss suffered (a) by the person . . . for whose benefit and guidance [the speaker] intends to supply the information . . . ; and (b) through reliance upon it in a transaction that [the speaker] intends the information to influence . . . or in a substantially similar transaction."  Restatement (Second) of Torts § 552(2); see also Nycal Corp v. KPMG Peat Marwick LLP, 688 N.E.2d 1368, 1371-72 (Mass. 1998) (quoting Restatement (Second) of Torts § 552(2)).  Moreover, the comments to the Restatement clarify that a defendant may only be liable when one relies on information negligently supplied by the defendant and when the defendant "is manifestly aware of the use to which the information was to be put and intended to supply it for that purpose."  Restatement (Second) of Torts § 522(2) cmt. a; see also Craig v. Everett M. Brooks Co., 222 N.E.2d 752, 755 (Mass. 1967) ("where the identity of the only possible plaintiff and the extent of his reliance were known to the defendant, and where damages are not remote" defendant may be liable in negligence).  Thus, a speaker must know how the receiver of information will use that information and intend to supply information for the benefit of that use to be liable for negligent misrepresentation.

18

For the reason described above, Almeida's statement that King would come back as CEO of Covidien in the future cannot form the basis for a negligent misrepresentation claim because King does not allege, nor could he, that he relied on that statement to his detriment.

As to the other alleged misrepresentations, however, King does allege reliance. Notwithstanding this purported reliance, however, the First Amended Complaint fails to allege that Defendants knew that King was considering leaving the company or that he was using the information provided by Defendants about the future of the company in making that decision. The absence of any such allegation of knowledge on the part of Defendants is fatal to King's negligent misrepresentation claim, because without being aware that King was considering leaving Covidien, Defendants could not possibly have "intend[ed] the information to influence" King's decision.  Nycal Corp, 688 N.E.2d at 1372.  Thus, to the extent an employee's decision to leave a company is a "transaction" that could subject an employer to liability for negligent misrepresentation, it cannot do so here because there is no allegation that Defendants were aware that "transaction" was taking place, let alone that they intended any information they supplied to King to influence it.

King has asserted that, even though he never told Defendants he was considering leaving Covidien, Defendants should have known that he was thinking about it because he had repeatedly complained about Almeida and Hanson's relationship from 2011 to 2014.  The court finds no support for this unstated conclusion in the allegations of the First Amended Complaint, which demonstrate that over the course of nearly three years King complained about Hanson and Almeida's relationship several times, but never that he suggested his dissatisfaction would be reason for leaving.  Moreover, if anything, King's staying with Covidien for nearly three years while still complaining about Almeida and Hanson could have reasonably led Defendants to

believe that, though he was displeased with the relationship, he would not leave the company over it.  Accordingly, because King has not plausibly alleged that Defendants knew that he was considering leaving Covidien or that he was relying on information supplied by Defendants for the purpose of making that decision, King's second cause of action for negligent misrepresentation fails to state a claim.

5.        *Count III—Breach of Fiduciary Duty*

King brings Count III for breach of fiduciary duty based on Almeida's failure to disclose the Medtronic merger negotiations to him.  See First Am. Compl. ¶¶ 98-100. King asserts that Almeida owed Covidien "and its shareholders a fiduciary duty to communicate truthfully with shareholders" and that Almeida breached this fiduciary duty owed to King as a holder of Covidien shares and stock options.  Id. ¶¶ 97-98, 100.

"To establish a breach of fiduciary duty, there must be a duty owed to the plaintiff by the defendant and injury to the plaintiff proximately caused by the breach."  Estate of Moulton v. Puopolo, 5 N.E.3d 908, 921 (Mass. 2014).  Both sides' briefing on this cause of action address when a corporation owes a duty to disclose merger negotiations.  That is, generally, that a company may remain silent regarding merger negotiations unless disclosure is necessary to correct previously misleading information or if the company has previously affirmatively denied the existence of merger negotiations.  See Basic, Inc. v. Levinson, 485 U.S. 224, 239 n.17 (1988) ("Silence, absent a duty to disclose, is not misleading under [the securities laws].");  In re Time Warner Sec. Litig., 9 F.3d 259, 268 (2d. Cir. 1993) ("A duty to disclose arises whenever secret information renders prior public statements materially misleading, not merely when that information negates the public statements.");  Vladimir v. Bioenvision, 606 F. Supp. 2d 473, 487

(S.D.N.Y. 2009) (affirmative denials of merger negotiations "giv[e] rise to a duty to disclose the truth").

Here, King does not allege facts supporting a claim that Defendants' non-disclosure of the merger negotiations breached any fiduciary duty they owed to shareholders in general. Specifically, because King does not allege that partial or misleading disclosures about the merger were ever publicly made, Defendants' continued silence breached no duty. Accordingly, to the extent King's breach of fiduciary duty cause of action is based on a duty Defendants owed King as a shareholder it fails.

To the extent King asserts that Almeida owed King alone a duty to disclose the merger negotiations because King not only was a shareholder but also held a high position in the company, then King essentially asserts that, as an executive owning company shares, he was entitled to receive and act on inside information that the public was not entitled to receive. The court is aware of no rule that gives high-ranking executives the right to such inside information, and were one to exist, it would presumably be preempted by the securities laws' prohibition on selective disclosures and insider trading. See Bateman Eichler, Hill Richards, Inc. v. Berner, 472 U.S, 299, 313 (1985) ("[I]nsiders and brokers who selectively disclose material non-public information" commit a broad range of violations). Indeed, in this case, King admits that his damages flow from the allegation that he would not have exercised his stock options had he known about the merger. This is, in essence, an allegation that King had the right to selectively receive non-public information and the right to exercise his options based on that information— i.e. engage in insider trading. To the extent King's breach of fiduciary duty cause of action asserts such rights, it must be dismissed.

Finally, to the extent King contends that the duty that Almeida owed him to disclose the merger negotiations was not based on King's role as a shareholder or high ranking executive, but was based on previous misleading statements about the course of the company, that is merely a re-packaging of his misrepresentation claim.  As discussed above, King's misrepresentation cause of action fails, in part, because he does not allege that any statement regarding the merger was ever made that would have given rise to any duty of any Defendant to speak at all on that topic.  King's breach of fiduciary duty cause of action, to the extent it is based on the same alleged misrepresentations, fails for the same reason.   Accordingly, however construed, King's breach of fiduciary duty cause of action fails to state a claim and is dismissed.

IV.     <u>Conclusion</u>

For the foregoing reasons, Defendants' <u>Motion to Dismiss</u> [#9] is ALLOWED.  No later than February 11, 2016, Plaintiff may file a motion for leave to amend the First Amended Complaint to modify Count IV as a claim for relief under § 510 of ERISA.  Any such motion shall include a certificate that counsel have conferred and attempted in good faith to resolve or narrow the issue as required by Local Rule 7.1.

IT IS SO ORDERED.

Date: January 28, 2016                                              /s/ Indira Talwani
                                                                                       United States District Judge